640 So.2d 237 (1994)
CITY OF NEW ORLEANS
v.
BOARD OF COMMISSIONERS OF the ORLEANS LEVEE DISTRICT.
No. 93-C-0690.
Supreme Court of Louisiana.
July 5, 1994.
Rehearing Denied September 22, 1994.
*240 Kathy Lee Torregano, City Atty., Nancy E. Graham, Philip C. Ciaccio, Jr., Bruce E. Naccari, New Orleans, for applicant.
Scott W. McQuaig, McQuaig & Solomon, Gary G. Benoit, Metairie, for respondent.
Joseph William Fritz, Jr., Joseph Michael Orlesh, Gerald O'Brien Gussoni, Jr., New Orleans, amicus curiae, for Bd. of Com'rs of The Orleans Levee Dist.
DENNIS, Justice.[*]
This controversy arose when the Orleans Levee District (OLD) began to build a marina and related developments for commercial profit on state owned land inside the City of New Orleans without complying with the municipal zoning and building ordinances. The City of New Orleans (CNO) brought this suit against the OLD for declaratory judgment and an injunction to restrain the OLD's violation of the ordinances. The *241 OLD filed a peremptory exception of no cause of action contending that as a state agency it cannot be enjoined from using state owned property to perform a governmental function. The trial and appeals courts decided that the CNO could not enforce its zoning and building laws against the OLD, observing that a state statute enabling OLD's land development activities constituted an exercise of the state police power that superseded the CNO's constitutional home rule powers of legislation and regulation. City of New Orleans v. Board of Com'rs, 612 So.2d 318 (La.App. 4th Cir.1993). We granted certiorari to decide whether OLD's enabling acts, La.R.S. 38:307 and 336, prevent the CNO from applying and enforcing the zoning and building ordinances adopted pursuant to its home rule charter powers. La. Const. 1974 art. VI, § 4. We now conclude that they do not and reverse.
The CNO's constitutionally granted home rule powers include the power to initiate and enforce local building and zoning ordinances consistent with the constitution within the city boundaries. The CNO's home rule powers also include the power of immunity from the legislature's authority to withdraw, preempt, or deny the city's power to initiate such legislation. The CNO's initiation of building and zoning ordinances to regulate the use of state land by the OLD for the purposes alleged does not constitute an abridgment of the police power of the state.

A. ALLEGATIONS OF PETITION
The purpose of an exception of no cause of action is to determine the sufficiency in law of the petition. The exception is triable on the face of the papers and for the purposes of determining the issues raised by the exception, the well pleaded facts in the petition must be accepted as true. La.Code Civ.Proc. arts. 927, 931; Owens v. Martin, 449 So.2d 448 (La.1984); Darville v. Texaco, Inc., 447 So.2d 473 (La.1984); Haskins v. Clary, 346 So.2d 193 (La.1977).
The petition of the plaintiff, the CNO, alleges that: In the early 1980's, defendant, the OLD, notified the city that it planned to develop a marina on land within the city that it had reclaimed from Lake Pontchartrain. The OLD is authorized by state law to reclaim, own, and develop certain parts of the lake bottom inside the city. CNO's zoning regulations require, however, that the developer of such a project as a marina obtain special approval as a conditional use from the city. OLD began construction of the marina in February, 1984 without obtaining such approval. OLD began construction of 26 covered boat slips in March, 1986 without applying for building permits as required by municipal building ordinances. After representing to the city that it would seek special approval for the conditional marina use in order to obtain building permits for its contractors in 1986 and 1987, the OLD in June of 1988 informed CNO that it would not comply because the municipal ordinances were not legally enforceable against the state agency. OLD began further construction on the land in May, 1990 without obtaining special approval or building permits. OLD's police officers in May, 1990 ordered a city building inspector to leave the property. OLD has never applied for special approval of the conditional marina use and has repeatedly failed to apply for building permits with regard to construction. CNO is empowered by the state constitution and its preexisting charter to exercise home rule powers to adopt and apply zoning and building ordinances within the city boundaries. The land development that OLD is pursuing consists of commercial or profit-making, non-governmental activities subject to the home rule legislative and executive powers of the CNO.

B. QUESTIONS PRESENTED
The questions of law presented by the CNO's petition are:
Question 1: Whether the constitutionally granted legislative power of the home rule government of the CNO includes the power to initiate, adopt, and enforce zoning and building ordinances within the city boundaries.
Question 2: Whether the CNO, whose home rule charter was in existence when the constitution was adopted, and which therefore retained the home rule powers, functions, and duties granted by its charter when *242 the constitution was adopted, except as inconsistent with the constitution, is constitutionally immune from the power of the legislature to withdraw, preempt, or deny the city's power to enact and enforce zoning and building ordinances within its boundaries.
Question 3: Whether the CNO's application and enforcement of its zoning and building ordinances to regulate the land development activities of the OLD, a state authorized agency, within the city boundaries, abridges the police power of the state in violation of the state constitution.

C. CONCLUSIONS AND REASONING

Conceptual and Experiential Background
Local governmental autonomy or home rule is not a self-sufficient or absolute virtue. In actuality, it may exist only to the extent that the state constitution endows a local governmental entity with two interactive powers, viz., the power to initiate local legislation and the power of immunity from control by the state legislature. Clark, Judges and the Cities, 60-81 (1985). In other words, these powers, initiation and immunity, are the yin and yang that combine to produce all of the autonomy that a home rule local government may come to have. By the period of January 1973 through April 1974, when the present Louisiana Constitution and its Local Government Article were drafted, debated, and ratified, these concepts and their history were well known to home rule scholars and advocates. See e.g., VII Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Sept. 25, 1973, statements of Delegate Lanier at 1395-96 (1977) [hereinafter cited as Records]; Id. Statements of Delegate Stagg, at 1400; Id. Sept. 21 at 1363-64.
The first power, initiation, refers to a local government's ability to initiate legislation and regulation in the absence of express state legislative authorization. For example, if local governments have the power to regulate and legislate with respect to land use and zoning, then they are also able to initiate plans and designs for the formal spatial configuration of local economic activities. Clark, supra, at 60-75; Sato & Van Alstyne, State and Local Govt Law, 136-43 (1977). The power of immunity, on the other hand, is essentially the power of localities to act without fear of the supervisory authority of the state government. Immunity exists to the extent that the local entity is insulated from state legislative control. See Clark, supra, at 68. For example, a certain degree of immunity would result from a constitutional provision barring the legislature from changing local ordinances except by general law or by a supermajority vote. This basic distinction between the power of initiation and the power of immunity provides an interpretive key to comprehending diverse state constitutional home rule provisions. Sands & Libonati, Local Govt Law § 4.07 (supp, 1993).
Before the turn of the century, a concept known as Dillon's rule, so named after one of its leading exponents, came to be widely recognized. Under that rule, unless the state constitution provides otherwise, local governments have no independent power of initiation or immunity; they possess only those powers granted them by the state legislature. Dillon, Municipal Corporations, §§ 230, 233, 237 (5th ed. 1911). The subsequent development of home rule may be seen as a struggle to overcome the Dillon rule with constitutional grants of powers of initiation or immunity to local governments and the growing recognition that both are necessary to any genuine degree of local autonomy.
Early constitutional amendments attempted to provide a measure of home rule by enabling localities to legislate with respect to "municipal affairs." Ohio Const. art. XVIII, § 3 (adopted 1912) ("all powers of local self-government"); Cal. Const. art. XI, § 6 (adopted 1896) ("municipal affairs"); Wis. Const. art. XI, § 3 (adopted 1924) ("local affairs and government"). These constitutional provisions granted both the power of initiation in regard to "local affairs" and the power of immunity from state regulation in this sphere. Court decisions interpreting this type of state-local test were inconsistent, however, and generally reflected either hostility toward home rule or undue deference to legislative intervention. Bishop v. San Jose, 1 Cal.3d 56, 81 Cal.Rptr. 465, 460 P.2d 137 *243 (1969); County Securities Inc. v. Seacord, 278 N.Y. 34, 15 N.E.2d 179 (1938); Van Gilder v. City of Madison, 222 Wis. 58, 267 N.W. 25 (1936); Sato & Van Alstyne, supra, at 147-51; Vanlandingham, Municipal Home Rule in the United States, 10 Wm. & Mary L.Rev. 269 (1968). The degree of local autonomy that home rule advocates believed they had gained through constitutional amendments was eroded by court decisions characterizing many interests as "state" interests and thus beyond the scope of local regulation. Newport Amusement Co. v. Maher, 92 R.I. 51, 166 A.2d 216 (1960); Pacific Tel. & Tel. Co. v. San Francisco, 51 Cal.2d 766, 336 P.2d 514 (1959).
In 1953, the American Municipal Association (later, the National League of Cities (NLC)) sought to remedy the deficiency of the state-local test by proposing a model state constitutional provision under which all delegable legislative powers would be granted to the local government, subject to the legislature's power to deny local government's exercise of authority by state statute. American Municipal Ass'n, Model Constitutional Provisions for Municipal Home Rule, § 6 (1953). In 1968, the National Municipal League (NML) amended the NLC model to provide more immunity by providing that "[a] ... city may exercise any legislative power ... not denied ... by general law." National Municipal League, Model State Constitution § 8.02 (6th ed. 1963). Some states following the NML model required that the legislature must expressly deny or prohibit, in order to override, a local government's particular exercise of legislative power. Mont. Const. art. XI, § 6 (adopted 1972); N.M. Const. art X, § 6 D (adopted 1970); Alaska Const. art. X, § 11 (adopted 1956).
Judicial interpretation and application of these models, however, continued to reflect undue concessions to acts of the legislature that tended to deprive local governments of authentic home rule. Chugach Electric Ass'n v. City of Anchorage, 476 P.2d 115 (Alaska 1970); State v. Haswell, 147 Mont. 492, 414 P.2d 652 (1966); Vanlandingham, Constitutional Municipal Home Rule Since the AMA (NLC) Model, 17 Wm. & Mary L.Rev. 1 (1975); Sharp, Home Rule in Alaska: A Clash Between the Constitution and the Court, 3 UCLA-Alaska L.Rev. 1, 17 (1973). Consequently, the drafters and ratifiers of the 1974 Louisiana Constitution adopted more stringent forms of home rule safeguards. These provisions grant broad powers of immunity from control by the state legislature to two classes of home rule governments when they are exercising their legislative powers as authorized by the constitution, viz., (1) to preexisting home rule municipalities and parishes when exercising within their boundaries any legislative powers not in conflict with the 1974 state constitution; and (2) to all other local governments exercising home rule powers consistently with that constitution except when the exercise of such a power is denied by general law. La. Const. 1974 art. VI, §§ 4, 5, 7. In recent years, growing numbers of home rule exponents have come to realize that such provisions are necessary to guarantee any substantial degree of genuine local autonomy. See Vaubel, Toward Principles of State Restraint Upon the Exercise of Municipal Power in Home Rule, XXII Stetson L.Rev. 643 (1993) (citing other authorities); Vaubel, Toward Principles of State Restraint Upon the Exercise of Municipal Power in Home Rule, XX Stetson L.Rev. 5 (part I), 845 (part II) (1991) (citing other authorities).

1.
The CNO home rule powers of initiation include the power to initiate and enforce zoning and building ordinances within the city boundaries.
Article VI, § 4 of the 1974 Louisiana Constitution, which grants the CNO both the power of initiation and the power of immunity, provides:
§ 4. Existing Home Rule Charters and Plans of Government
Section 4. Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when *244 this constitution is adopted. If its charter permits, each of them also shall have the right to powers and functions granted to other local governmental subdivisions.
Although the principles of initiative and immunity are related and interdependent, in answering and discussing question one we focus primarily on the CNO's power of initiation.
There are three primary, interrelated sources of the CNO's power to initiate legislation and regulation: Article VI, § 4 of the 1974 state constitution; the preexisting city home rule charter; and any amendments to the charter, subsequent to the adoption of the constitution, made pursuant to methods provided by the charter. Article VI, § 4 constitutionally maintains the preexisting CNO charter in effect, including the powers, functions, and duties provided for by that charter, except as inconsistent with the 1974 constitution. Section 4 further provides that subsequent to the adoption of the 1974 constitution the CNO charter may be amended, modified, or repealed pursuant to the methods set forth in the charter. In effect, Section 4 constitutionalizes the CNO charter, as amended by the local electorate according to methods provided by the charter, except insofar as the governmental powers, functions, and duties provided by the charter are inconsistent with provisions of the 1974 constitution.
Article VI, § 4 provides an additional or secondary source of initiative power for a preexisting home rule municipality, viz., that, if the city's charter permits, the municipality shall have the right to powers and functions granted to other local governmental subdivisions. We need not consider that source in the present case, however, because the CNO relies solely upon the broad grant of power set forth in its own charter.
Accordingly, Article VI, § 4 limits a preexisting home rule charter's grant of the power of initiation only by providing that the local government may not exercise that power inconsistently with the 1974 constitution. In contrast, a local governmental subdivision that acquires home rule powers subsequent to the adoption of the 1974 constitution is authorized to exercise such powers only when "necessary, requisite, or proper for the management of its affairs." La. Const. 1974, Art. VI, §§ 5(E), 7. In this respect, therefore, a preexisting home rule city or parish potentially enjoys the power to initiate legislation to a greater degree than other local governmental subdivisions.
The nature or content of the CNO's power to initiate legislation is determined by the provisions of the preexisting charter maintained in effect by the 1974 state constitution and amendments thereto, if any, adopted pursuant to the charter. Article II, section 2-101 of the CNO home rule charter of 1954, which was in existence when the 1974 Louisiana Constitution was adopted, contains a declaration of the municipality's home rule powers:
Section 2-101. Powers.
(1) The City shall retain, to the same extent as if herein repeated, all rights, powers, privileges and authority that it has or could claim under the law of this State at the time of the adoption hereof, except as herein expressly modified.
(2) In addition to the foregoing, the City shall have all rights, powers, privileges and authority herein conferred or herein enlarged, and all rights, powers, privileges and authority whether expressed or implied that may hereafter be granted to a similar corporation by any general law of the State, or that may be necessary or useful to enjoy a home rule charter.
(3) The rights, powers, privileges and authority heretofore enjoyed, herein retained or herein claimed shall subsist, notwithstanding the repeal of any law, until any such right, power, privilege or authority be altered or taken away by amendment to this Charter in the manner provided for by the Constitution.
(4) The City, in addition to the rights, powers, privileges and authority expressly conferred upon it by this Charter, shall have the right, power, privilege and authority to adopt and enforce local police, sanitary and similar regulations, and to do and perform all of the acts pertaining to its local affairs, property and government, which are necessary or proper in the legitimate *245 exercise of its corporate powers and municipal functions.
(5) No enumeration of any right, power, privilege or authority hereinafter made, and no repeal of any law under which the City derives any right, power, privilege or authority, shall be construed as limiting or abolishing any right, power, privilege or authority hereinabove set forth.
Section 2-101 of the charter has not been amended subsequent to the adoption of the 1974 constitution. Therefore, that provision continues to set forth the inherent character and basic composition of the CNO home rule power of initiation.
In essence, Section 2-101 of the charter stakes a continuing claim, without self-imposed limits, to the utmost powers of initiation available to the city under the constitution. The CNO has "the right, power, privilege and authority to adopt and enforce local police, sanitary and similar regulations, and to do and perform all of the acts pertaining to its local affairs, property and government, which are necessary or proper in the legitimate exercise of its corporate powers and municipal functions." Id. § 2-101(4). Additionally, Section 2-101 asserts for the city all powers that could be claimed under the law of the state at the time of the adoption of the charter, id. § 2-101(1), subsequent enlargements of those powers, id. § 2-101(2), any power granted to a similar corporation, id., and all powers "that may be necessary or useful to enjoy a home rule charter." Id. In sum, therefore, the CNO home rule charter asserts, and Article VI, § 4 of the constitution authorizes the city to exercise, any legislative power within its boundaries that is not inconsistent with the 1974 constitution.
The power to enact and enforce zoning and building laws plainly falls within the CNO's home rule power to initiate legislation and regulation. Zoning laws and related land use regulations are based on, and constitute an application or exercise of, legislative power, and in particular, police power to enact laws for the safety, health, morals, convenience, comfort, prosperity, and general welfare of the people. Village of Euclid v. Ambler Realty Co. 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Four States Realty Co. Inc. v. Baton Rouge, 309 So.2d 659, 664 (La.1975) (On rehearing); McCauley v. Albert E. Briede & Son, 231 La. 36, 90 So.2d 78 (1956); State ex rel Dema Realty Co. v. McDonald 168 La. 172, 121 So. 613, cert denied, 280 U.S. 556, 50 S.Ct. 16, 74 L.Ed. 612 (1929); State ex rel. Civello v. New Orleans, 154 La. 271, 97 So. 440 (1923). The exercise of this police power to regulate land use by the CNO as part of its retained home rule legislative power is not generically inconsistent with any provision of the constitution. In fact, the zoning power of the CNO is positively confirmed by Article VI, § 17 of the constitution which authorizes local governmental subdivisions to adopt regulations for land use, zoning, and historic preservation. In view of the foregoing, we conclude that the CNO home rule powers include the authority to adopt and enforce zoning and building ordinances within the city boundaries.

2.
The CNO is immune from the power of the legislature to withdraw, preempt, or deny the city's power to enact and enforce zoning and building ordinances consistent with the constitution within its boundaries.
The text of Section 4 of Article VI plainly indicates that the drafters and ratifiers intended to emancipate and continue in effect the preexisting home rule charters free of the conditions and restraints that had been placed upon them by the 1921 Constitution. Section 4 grants every preexisting home rule government, with respect to the constitutional exercise of its power of initiation, the power of immunity from the control of the legislature. Because Section 4 constitutionally maintains in effect each preexisting home rule charter and the powers, functions, and duties provided for by that charter, except as inconsistent with the 1974 Constitution, the legislature may not control, restrain, or override a preexisting home rule government's valid exercise of the power to initiate legislation that is consistent with the constitution. Accordingly, unless a legislative act by a preexisting home rule government exceeds some limit placed upon its power of *246 initiation by the 1974 Constitution, that government's power of immunity prevents the legislature from reversing, withdrawing, or denying an exercise by that city or parish of its power to enact and enforce that local law.
This meaning of Section 4 is confirmed by an examination of the context in which it occurs and the text of the local government article as a whole. Significantly, there is nothing in Section 4 that authorizes the legislature to deny by general law the exercise of a power by a preexisting home rule city or parish. Moreover, nothing in Section 4 limits the scope of the charter powers of a preexisting home rule city or parish, except the proviso that requires such powers to be exercised in conformity with the 1974 constitution. On the other hand, local governmental subdivisions that acquire home rule powers after the adoption of the constitution do not enjoy the same degree of immunity from control by the legislature. Article VI, § 5 authorizes any such local governmental subdivision to adopt a home rule charter providing for the exercise of any power "necessary, requisite, or proper for the management of its affairs, not denied by general law or inconsistent with this constitution." Subject to and not inconsistent with the 1974 constitution, Article VI, § 7 authorizes any local governmental subdivision which has no home rule charter to assume and exercise any power "necessary, requisite, or proper for the management of its affairs, not denied by its charter or by general law, if a majority of the electors approves the assumption of that power in an election held for that purpose." Accordingly, the exercise of the power to initiate local laws by a preexisting home rule city or parish, unlike that by other local governmental subdivisions, may not be reversed by the legislature on the ground that the exercise was not "necessary, requisite, or proper for the management of its affairs" or that it has been "denied by general law."
Likewise, the drafting history of the local government article as reflected by the transcripts of the constitutional convention debates clearly reflects that the delegates intended to confer a greater degree of immunity upon preexisting home rule cities and parishes than upon local governmental subdivisions that acquired home rule powers subsequent to the adoption of the 1974 constitution. The delegates polarized on the question of local autonomy, with a group on one extreme opposing any power of immunity for localities and a faction on the other advocating the substantial insulation of all municipalities from the legislature's exercise of the police power of the state. Bolstered by the votes of delegates representing preexisting home rule governments, the local government forces convinced the convention to adopt the provision that would later become Article VI, § 4. The convention understood that this provision would immunize the preexisting home rule governments from control by the legislature when they exercised their powers of initiation consistently with the constitution. Records, supra, Sept. 19, at 1319-40. Subsequently, however, a strenuous and protracted debate took place when the home rule progressives attempted to extend Section 4-type immunity to all localities. The Dillon rule advocates mounted a fierce counteroffensive in an attempt to make all remaining local government subdivisions completely subservient to the prerogative of the legislature. Records, supra, Sept. 21-22, at 1357-79, Sept. 25 at 1408-16. Ultimately, the convention adopted a compromise between the positions of the contending factions. The delegates agreed upon the provisions that became Sections 5 and 7 of Article VI, specifying that localities assuming home rule powers after the adoption of the constitution shall enjoy immunity from control by the legislature in the constitutional exercise of their powers of initiation, necessary for the management of their affairs, except when the local government's exercise of such power is denied by its charter or by general law. Records, supra, Sept. 20-26, at 1340-53, 1356-79, 1395-1415, 1427-32.
In any event, because the vote of the people was the political act that made the 1974 constitution binding, it is the understanding that can reasonably be ascribed to the electorate that controls. Succession of Lauga, 624 So.2d 1156, 1164-65 (La.1993); City of New Orleans v. Scramuzza, 507 So.2d 215 (La.1987); Board of Com'rs of Orleans Levee Dist. v. Department of Natural Resources, 496 So.2d 281 (La.1986); Bank of *247 New Orleans & Trust Co. v. Seavey, 383 So.2d 354 (La.1980); Chehardy v. Democratic Executive Comm., 259 La. 45, 249 So.2d 196 (1971); Devlin, Privacy and Abortion Rights Under the Louisiana State constitution: Could Roe v. Wade Be Alive and Well in the Bayou State, 51 La.L.Rev. 685, 689-90. We believe that the people must have understood that the document would extend a broader power of immunity to the preexisting home rule entities than to the remaining localities which might assume home rule powers subsequent to the adoption of the constitution. Article VI, § 4 commands that the preexisting home rule charters shall remain in effect, retaining in force the powers provided for thereby, subject only to the exception that these powers cannot be exercised inconsistently with the 1974 constitution. Sections 5 and 7, on the other hand, impose additional exceptions upon the power of immunity granted to the remaining local governments which might assume home rule powers subsequent to the adoption of the constitution. That immunity is defeasible under Section 5 when the exercise of a home rule power is denied by a general law; under Section 7 it is inoperative when this occurs and when the exercise of the power is denied by the local governmental subdivision's charter. Furthermore, the media accounts of the constitutional convention debates informed the public that the local government article draft granted the greatest powers of immunity to the preexisting home rule cities and parishes. See Gillis & Hargroder, Local Power Section Fails: Proposal in CC-73 to be Reconsidered Today, Times-Picayune, Sept. 26, 1973, § 1, at 1; Gillis & Hargroder, Moves to Cut Local Power Are Rejected, Times-Picayune, Sept. 22, 1973, § 1, at 1; Hargroder & Gillis, New Language Voted by CC-73, Times-Picayune, Sept. 21, 1973, § 1, at 1; McMahon, CC/73 Puts Local Govt Under Constitution, Morning Advocate, Sept. 21, 1973, § B, at 1.
We reject the notion suggested by the lead opinion in The City of New Orleans v. State, 426 So.2d 1318, 1320-21 (La.1983) that Article VI, § 4 of the 1974 Louisiana Constitution adopts by implied reference a 1921 constitutional provision that requires the CNO's exercise of its home rule power to yield to any inconsistent general state law. That part of the lead opinion does not constitute precedent because it was signed only by its author, the other members of the court having dissented or concurred for different reasons. Id. at 1322. Nevertheless, the reasons that the interpretation suggested by that opinion was erroneous should be explained as a stay against future confusion.
Article XIV, § 17 of the 1974 Louisiana Constitution provides that, "[e]xcept to the extent provided in this Article and except as retained in Articles I through XIII of this constitution, the provisions of the Constitution of 1921 are repealed." This Section indicates that the intention of the framers and the electorate to retain a prior constitutional provision must be explicit or clearly and unambiguously implicit in the new document itself in order to save the prior provision from repeal. In other words, a merely ambiguous suggestion of retention does not as a general rule justify further interpretation by a court in search of such an intention. The drafting history confirms this meaning. See, e.g., Records, supra Jan. 18, 1974, statements of Delegates Jenkins and Zervigon at Vol. IX, 3482.
Statement of Delegate Jenkins:
So, then your intention is that unless a provision has been particularly retained from the 1921 Constitution then it is repealed as a part of the constitution of this state although it may be retained as a statute. That is your intention, is that correct?
* * * * * *
Statement of Delegate Zervigon:
That's right, ... That's the intention of the committee.
The provision of Article XIV, § 22 of the 1921 Constitution that the CNO "shall ... not exercise any power or authority which is inconsistent or in conflict with any general law," was both a limitation on the City's home rule powers and a reservation of the power of the legislature to supersede the City's ordinances by any inconsistent general law. That prior constitutional provision was not expressly retained by the 1974 Constitution *248 in its first thirteen articles or in its Article XIV. The lead opinion in The City of New Orleans v. State, supra, seems to suggest that such a retention is implied by Article VI, § 4, which, in pertinent part, provides that "[e]xcept as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted." If any such suggestion can be divined in Section 4, however, it certainly cannot be said that it is clearly and unambiguously implicit in the document itself.
Section 4 explicitly retains all local governmental powers in effect under the home rule charters at the time of the adoption of the 1974 Constitution, except as inconsistent with that constitution. On the other hand, Section 4 does not explicitly or by clear and unambiguous implication retain any 1921 Constitutional limitation on those powers or any prior constitutional reservation of the legislature's authority to override the exercise of those powers. If Section 4 hints that a prior constitutional provision is retained, it does so in such a vague, opaque, and ambivalent manner that it is also easily susceptible of an entirely different meaning. Obviously, therefore, Section 4 does not explicitly or by clear and unambiguous implication retain specifically Article XIV, § 22 of the 1921 Constitution that allowed the legislature to supersede the exercise of the CNO's home rule power simply by enacting an inconsistent general state law.
Additionally, Section 4 grants to all preexisting home rule cities and parishes the power to amend their charters by the methods provided for in each charter. This provision indicates that those local governments may add powers and delete limitations upon their powers, except as inconsistent with the 1974 Constitution. These grants of autonomous amendment powers clearly show that the framers of the 1974 Constitution and the people who voted for it did not intend for the preexisting home rule governments to be shackled by the 1921 Constitutional limitations and reservations that tended to give the legislature control over them. Accordingly, we conclude that Article XIV, § 22 of the 1921 Louisiana Constitution was not retained by any provision of the 1974 Constitution but was repealed in accordance with Article XIV, § 17 of that constitution. See, e.g., Records, supra, Sept. 19-20, at 1321-40.
Even though further interpretation in search of a contrary intention is not warranted, our confidence in the foregoing conclusion is bolstered by the drafting history of Section 4. The delegates clearly indicated their intention not to adopt the 1921 Constitutional limitations and reservations affecting the preexisting home rule powers. In fact, a floor amendment was adopted to make certain that Section 4 would not be interpreted as incorporating prior constitutional provisions by reference. That amendment deleted a provision that originally stated that each preexisting home rule charter "shall be subject to the duties imposed by the applicable constitutional provisions under which its plan or charter was adopted." Records, supra, Sept. 19, at 1319. The deletion of this provision clearly indicates that the drafters did not intend for the preexisting home rule charters to be controlled in any respect by the 1921 Constitution. See, e.g., Records, supra, Sept. 19-20, at 1321-40.
Furthermore, Section 4 of Article VI cannot be construed without absurdity to permit the legislature to supersede the ordinances of the CNO simply by enacting an inconsistent general state law; for this would reduce the immunity of the CNO to a level below that of the nonantecedent home rule governments whose valid ordinances are protected by Sections 5 and 7 of Article VI from reversal by the legislature except by general state laws that deny, rather than merely conflict with, their local laws. To interpret the Constitution as conferring on the CNO a power of immunity no greater [or weaker] than that attributed to the local governments which acquire home rule authority after the adoption of the 1974 Constitution would conflict with the clear intent of the drafters and rarifiers to grant all preexisting home rule governments a greater degree of autonomy.

*249 3.
The CNO's enactment and enforcement of zoning and building ordinances to regulate the OLD's development and use of land within the city does not abridge the police power of the state.
Article VI, § 9(B) provides that "[n]otwithstanding any provision of this Article, the police power of the state shall never be abridged." Without further interpretation, Section 9(B) on its face is ambiguous. Superficially, the section could be understood by many to be an articulation of the universal principle of constitutional law that a state cannot surrender the police power, a principle so well established that it requires no written expression, or it might be understood by others to be an oblique cancellation of the home rule powers of immunity granted local governmental subdivisions by other sections of the Article. When Section 9(B) is read in light of the constitutional convention debates and the text of the whole Local Government Article, however, it is clear that the provision was adopted as a principle of harmonizing the replete home rule powers granted local governments with a basic residuum of the state's power to initiate legislation and regulation necessary to protect and promote the vital interests of its people as a whole.
The principle of constitutional law that a state cannot surrender, abdicate, or abridge its police power has been recognized without exception by the state and federal courts. See, e.g., Home Bldg. & Loan Ass'n. v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481 (1934); Phillips Petroleum Co. v. Jenkins, 297 U.S. 629, 56 S.Ct. 611, 80 L.Ed. 943 (1936); Board of Com'rs v. Department of Natural Resources, 496 So.2d 281 (La.1986); Francis v. Morial, 455 So.2d 1168 (La.1984); Fireside Mutual Life Ins. Co. v. Martin, 223 La. 583, 66 So.2d 511 (1953); Fernandez v. Alford, 203 La. Ill, 13 So.2d 483 (1943); Porterie v. Walmsley, 183 La. 139, 162 So. 826 (1935); Shreveport v. Kansas City, S & G. Ry. Co., 167 La. 771, 120 So. 290, 62 A.L.R. 1512 (1929). Because the police power is inherent in the sovereignty of each state, that power is not dependent for its existence or inalienability upon the written constitution or the positive law. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469 (1934); Peirce v. New Hampshire, 46 (5 How.) U.S. 504, 12 L.Ed. 256 (1847); Fernandez v. Alford, supra. Moreover, the constitution supposes the preexistence of the police power and must be construed with reference to that postulate of the legal order. Borden v. Louisiana State Bd. of Education, 168 La. 1005, 123 So. 655, 661, 67 A.L.R. 1183 (1929).
Consequently, the principle that the exercise of the police power of the state shall never be abridged needs no constitutional reservation to support it. In re Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872); Hickenbottom v. McCain, 207 Ark. 485, 181 S.W.2d 226, cert. denied, 323 U.S. 777, 65 S.Ct. 189, 89 L.Ed. 621 (1944); City of Pasadena v. Charleville, 215 Cal. 384, 10 P.2d 745 (1932); People v. City of Chicago, 413 Ill. 83, 108 N.E.2d 16 (1952); Superior Oil Co. v. Beery, 216 Miss. 664, 63 So.2d 115 (1953); Kansas City v. Kansas City Terminal Ry. Co., 324 Mo. 882, 25 S.W.2d 1055 (1929); State ex. rel. City of Minot v. Gronna, 79 N.D. 673, 59 N.W.2d 514 (1953); City of Scranton v. Public Serv. Com'n., 268 Pa. 192, 110 A. 775 (1920); Reesman v. State, 74 Wash.2d 646, 445 P.2d 1004 (1968). Therefore, the failure of the 1974 Louisiana Constitution to restate the precept as a general provision, as previous constitutions have done, La. Const. Art. 19, § 18 (1921) ("The exercise of the police power of the State shall never be abridged."); La. Consts. Art. 263 (1913), Art. 263 (1898), Art. 235 (1879) ("The exercise of the police power of the State shall never be abridged nor so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the state."), does not detract from the state's authority to safeguard the vital interests of its people.
The inalienability of the police power, however, does not preclude its delegation to municipalities and other governmental subdivisions because these entities are part of the total government of the state. Board of Com'rs v. Dept. of Natural Resources, 496 So.2d 281 (La.1986); Baton Rouge Waterworks, Co. v. La. Public Serv. Com'n, 156 La. 539, 100 So. 710 (1924); Fernandez v. Alford, 203 La. 111, 13 So.2d 483, 489 (1943); Ex *250 Parte Steckler, 179 La. 410, 154 So. 41 (1934); State v. City of New Orleans, 151 La. 24, 91 So. 533 (1922); McGee v. Police Jury of Caddo Parish, 63 So.2d 153 (La.App. 2nd Cir.1953); 6A McQuillin, Municipal Corporations § 24.07; See also id. § 24.36-.38 and cases cited therein. Furthermore, the people of the state through their constitution may vest and define police powers in municipalities and other governmental subdivisions. See Richland Gas Co., Inc. v. Hale, 169 La. 300, 125 So. 130 (1929); 6A McQuillin, supra, at § 24.38, n. 7 citing Clements v. McCabe, 210 Mich. 207, 177 N.W. 722 (1920); Cleveland Tel. Co. v. City of Cleveland, 98 Ohio St. 358, 121 N.E. 701 (1918). Unless such a constitutional delegation of police power provides otherwise, the delegation can be withdrawn or altered only by the constitutional amendment or convention process. See Hayden v. Louisiana Pub. Serv. Com'n, 553 So.2d 435, 442 (La.1989) (concurring opinion); Louisiana Consumers' League, Inc. v. Louisiana Pub. Serv. Com'n, 351 So.2d 128 (La.1977); Tull v. City of Baton Rouge, 385 So.2d 343 (La.App. 1st Cir.), writ denied, 392 So.2d 663 (1980); La Fleur v. City of Baton Rouge, 124 So.2d 374 (La.App. 1st Cir.1960); See La. Const. 1974, art. XIII.
Consequently, the constitutional grant of the home rule power to initiate legislation and the power of immunity from control of the legislature to a local government does not necessarily cause the state as a whole to sustain an abridgment of its police power. The total police power of the state is not diminished every time the legislature is constitutionally denied the right to substitute its legislative initiative for that of the home rule governments. A net loss in the exercise of the police power of the state would occur only when a local government's conflicting law or ordinance would prevent the state from initiating action through its legislative branch necessary to promote or protect the health, safety, welfare, or morality of the state as a whole. In other words, division and delegation of the police power within the state itself does not automatically cause its abridgment.
During the constitutional convention debates upon Article VI on local government, however, a number of delegates expressed concern that the grants of increased and replete home rule powers to localities that had been adopted in the provisions that became Sections 4, 5, and 7 might in effect cause an abridgment of the police power by preventing the legislature from enacting statewide laws necessary to promote the safety, health, morals, and welfare of the people of the state as a whole. In response, during the Fifty-Fourth Day's Proceedings, on September 26, 1973, while dealing with the provision that became Section 9, entitled "Limitations of Local Governmental Subdivisions," the convention adopted an amendment offered by Delegate Avant which stated:
(B) Notwithstanding any provision of any plan of local government or any home rule charter, or other provision of this article, the legislature may by general law applicable throughout the state or based on any reasonable classification exercise the police power of the state in the parishes, municipalities, and other local governmental subdivisions of the state.

Records, supra, Sept. 26, at 1445.
Delegate Avant explained that this amendment would "make it abundantly clear ... the legislature can exercise the police power of the state for the good of all of the citizens of the state irrespective of where they may live." Id.
The next day, however, the convention deleted Mr. Avant's amendment and replaced it with an amendment offered by Delegate Casey of the City of New Orleans that became Article VI, § 9(B), viz., "(B) Notwithstanding any provision of this Article, the police power of the state shall never be abridged." Mr. Casey and other delegates complained that the Avant amendment might cancel out grants of home rule powers contained in the sections of the Local Government Article previously approved by the convention. They expressed concern that under the Avant amendment home rule municipalities and parishes would have less autonomy than was afforded by the 1921 Constitution because, for example, the legislature could "preempt our local ordinances establishing our zoning laws," Records, supra, Statements *251 of Delegate Casey, Sept. 27, at 1454, and in many other ways "virtually take over local self-government." Id. Statements of Delegate Burson, at 1455.
Delegate Casey expressed the prevailing view of the delegates that the amendment which became Section 9(B) would represent a medium of compromise between the home rule provisions, which standing alone could be viewed as granting absolute and unqualified local autonomy, and the Avant provision, which had gone too far in the other direction and might be interpreted as annulling all local governmental powers of immunity. Mr. Casey indicated that the amendment was intended to "give to the state those things that are due rightfully for regulation by the state and give to municipalities those police powers which it rightfully should enjoy to conduct its own business." Records, supra, Sept. 27, Statements of Delegate Casey, at 1460.
However, later that day the convention by a vote of 52 to 68 rejected a proposed amendment that would have added the provision that "(C) This article shall not limit the power of the legislature to enact laws of statewide concern." Id. at 1461-65. The purpose of that proposal, as explained by its author, was "to give as much local home rule as possible, but yet to preserve to the state its interest to deal with statewide concern." Id. at 1462. Many delegates who successfully opposed the amendment favored strong home rule and acknowledged the need to reserve the power of the legislature to enact necessary general statewide laws. Id. Statements of Delegate Burson, at 1463-64. Nevertheless, they objected to a reservation of the power of the legislature to enact laws of "statewide concern." Id. Statements of Delegate Conroy, at 1464. They contended that this term was too open-ended and might be interpreted to allow the legislature to intrude into local government even when state laws were not necessary to protect the interest of the people as a whole. Id. Statements of Delegate Zervigon, at 1463.
From our reading of the foregoing passages within the context of the drafting history as a whole, we conclude that it was the aim of the constitutional convention by Section 9(B) of Article VI to vest in home rule municipalities and parishes the powers of immunity and initiation as provided for in Sections 4, 5, and 7 of Article VI, subject to a reservation to the state of that residuum of the police power required to enact and enforce laws necessary to protect and promote the lives, health, morals, comfort, and general welfare of its people as a whole. Undoubtedly, whatever is reserved of the legislature's authority to exercise the state's police power must be consistent with the fair intent of the constitutional limitation of that power. See New Orleans Firefighters Ass'n v. Civil Service Comm'n of New Orleans, 422 So.2d 402, 406-07 (La.1982). The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the legislature the unqualified power to withdraw, preempt, or overrule a local law that is consistent with the constitution and was enacted pursuant to a constitutionally maintained preexisting home rule charter. But it does not follow that conditions may not arise in which the legislature will be required to enact legislation that, despite its conflict with a valid local law, is necessary to protect the vital interests of the state as a whole and thus be found to be within the range of the reserved power of the state. Cf., Home Building & Loan Ass'n. v. Blaisdell, 290 U.S. 398, 439, 54 S.Ct. 231, 240, 78 L.Ed. 413 (1933) (explaining a similar principle of harmony between the contract clause and the police power).
We believe that this also was the "public" intent as to the meaning of Section 9(B), that is, the intention and understanding of the ratifiers that could have been gathered by a knowledgeable but objective observer from the text of that section and the Local Government Article in which it occurs. See Succession of Lauga, 624 So.2d 1156, 1164-65 (La.1993); City of New Orleans v. Scramuzza, 507 So.2d 215 (La.1987); Board of Com'rs of Orleans Levee Dist. v. Department of Natural Resources, 496 So.2d 281 (La.1986); Bank of New Orleans & Trust Co. v. Seavey, *252 383 So.2d 354 (La.1980); Chehardy v. Democratic Executive Comm., 259 La. 45, 249 So.2d 196 (1971); Devlin, supra, at 689-90. Article VI on Local Government imposes limits or exceptions upon the powers of all local governments that would have been unnecessary if the drafters and ratifiers had intended by Section 9(B) to reserve to the legislature the authority to withdraw, preempt, or reverse any local law. These constitutional exceptions or limitations to local government legislative power provide that the localities may not enact: (1) Local laws providing for the punishment of a felony, § 9(A)(1); (2) Ordinances governing private or civil relationships, except as provided by law, § 9(A)(2); (3) Local laws reducing the compensation of an elected official during the term for which he is elected, § 12; (4) Local laws establishing or affecting courts and their officers, § 25. These limitations on the powers of local governments would be virtually superfluous if Section 9(B) were read to grant the legislature the power to usurp a local government's exercise of the police power within its boundaries. By the same token, if the constitutional intention by Section 9(B) had been to reserve plenary power to the legislature, Article VI, § 14(5) creating an exception to local home rule powers of immunity regarding laws providing for civil service, minimum wages, hours, working conditions, and employment benefits for firemen and policemen would have been unnecessary and meaningless. See New Orleans Firefighters Ass'n, 422 So.2d 402, 406-07 (La. 1982). That the drafters and ratifiers intended and understood Section 9(B) to preclude a construction that would reserve to the legislature unlimited power to supersede home rule authority is also borne out clearly by the daily newspaper coverage of the controversial constitutional convention debates concerning home rule and the police power. See e.g., Gillis & Hargroder, Strong Home Rule Boasted in CC-73 Move: Sections on Police Power is Amended, New Orleans Times-Picayune, Sept. 28, 1973, § 1, at 1; Hargroder & Gillis, Police Power Voted to State: CC May Have Undone Home Rule Provisions, New Orleans Times-Picayune, Sept. 27, 1973, § 1, at 1.
As this court has observed, Article VI of the 1974 Louisiana constitution adopts a new philosophy of the state-local government relationship and strikes a balance in favor of home rule that calls for a corresponding adjustment in judicial attitude. Francis v. Morial, 455 So.2d 1168, 1173 (La. 1984); City of Shreveport v. Kaufman, 353 So.2d 995, 996-97 (La.1977); City of New Orleans v. State, 426 So.2d 1318, 1322 (La. 1983) (Concurring opinion); Kean, Local Government and Home Rule, 21 Loy.L.Rev. 63, 64, 66 (1975); Murchison, Developments in the Law, 1979-1980: Local Government Law, 41 La.L.Rev. 481, 487-88 (1981). Consequently, home rule abilities and immunities are to be broadly construed, and any claimed exception to them must be given careful scrutiny by the courts. Francis v. Morial, supra. In accordance with the expectations of the drafters and ratifiers, the principles which courts have developed in accommodating individual rights with the state's exercise of its police power are applicable by analogy to the resolution of conflicts between police measures and the constitutionally protected rights of home rule governments. Board of Com'rs v. Dept. of Natural Resources, 496 So.2d 281 (La.1986); Francis v. Morial, supra. Accordingly, a litigant claiming that a home rule municipality's local law abridges the police power of the state must show that the local law conflicts with an act of the state legislature that is necessary to protect the vital interest of the state as a whole. To establish that the conflict actually exists, the litigant must show that the state statute and the ordinance are incompatible and cannot be effectuated in harmony. Further, to demonstrate that the state statute is "necessary" it must be shown that the protection of such state interest cannot be achieved through alternate means significantly less detrimental to home rule powers and rights. Cf. State v. McHugh, 630 So.2d 1259, 1267-69 (La. 1994); State v. Perry, 610 So.2d 746, 755-61 (La.1992); Hondroulis v. Schuhmacher, 553 So.2d 398, 415 (La.1988) (on rehearing). For a similar analysis compare Sibley v. Board of Supervisors of LSU, 477 So.2d 1094, 1107-09 (La.1985) (on rehearing).

*253 4.
Application of Constitutional and Legal Precepts
The burden of demonstrating that no cause of action has been stated is upon the mover or exceptor. In deciding the exception of no cause of action, the court must presume all factual allegations of the petition to be true and all reasonable inferences are made in favor of the non-moving party. Owens v. Martin, 449 So.2d 448 (La. 1984); Darville v. Texaco, Inc., 447 So.2d 473 (La.1984); Haskins v. Clary, 346 So.2d 193 (La.1977); Pence v. Ketchum, 326 So.2d 831 (La.1976), overruled on other grounds by Thrasher v. Leggett, 373 So.2d 494 (La.1979); Hero Lands Co. v. Texaco, Inc., 310 So.2d 93 (La.1975); Louisiana State Board of Medical Examiners v. England, 252 La. 1000, 215 So.2d 640 (1968). In reviewing a trial court's ruling sustaining an exception of no cause of action, the court of appeal and this court should subject the case to de novo review because the exception raises a question of law and the lower court's decision is based only on the sufficiency of the petition. See Mott v. River Parish Maintenance, Inc., 432 So.2d 827 (La.1983); cf. Wright & Miller, Federal Practice and Procedure: Civil 2d § 1357 (1990); 2A Moore's Federal Practice § 12.07[2.  5] (1994).
In appraising the sufficiency of the petition we follow the accepted rule that a petition should not be dismissed for failure to state a cause of action unless it appears beyond doubt that the plaintiff can prove no set of facts in support of any claim which would entitle him to relief. Haskins v. Clary, 346 So.2d 193 (La.1977); Pence v. Ketchum, 326 So.2d 831 (La.1976); Hero Lands Co. v. Texaco, Inc., 310 So.2d 93 (La. 1975); See also Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The question therefore is whether in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the petition states any valid cause of action for relief. The petition should not be dismissed merely because plaintiff's allegations do not support the legal theory he intends to proceed on, since the court is under a duty to examine the petition to determine if the allegations provide for relief on any possible theory. Mott v. River Parish Maintenance, Inc., 432 So.2d 827 (La.1983); Darville v. Texaco, Inc., 447 So.2d 473 (La.1984); Haskins v. Clary, 346 So.2d 193 (La.1977); See Wright & Miller, supra § 1357.
As a practical matter, an exception of no cause of action is likely to be granted only in the unusual case in which the plaintiff includes allegations that show on the face of the petition that there is some insuperable bar to relief. In other words, dismissal is justified only when the allegations of the petition itself clearly demonstrate that the plaintiff does not have a cause of action, or when its allegations indicate the existence of an affirmative defense that appears clearly on the face of the pleading. Haskins v. Clary, 346 So.2d 193 (La.1977); Steeg v. Lawyers Title Ins. Corp., 329 So.2d 719 (La. 1976); Cf. Wright & Miller, supra § 1357.
When any land or structure is used in violation of an ordinance, or when any structure is erected, altered, extended, moved or maintained in violation of an ordinance, the CNO may institute any appropriate action to prevent, restrain, correct, or abate the violation. City of New Orleans, Comprehensive Zoning Ordinances, Art. 15, § 2.13; La.R.S. 33:4728; City of New Orleans v. Leeco Inc., 219 La. 550, 53 So.2d 490 (1951); See also 4 Anderson, American Law of Zoning 3rd, § 29.03 (1986) and authorities cited therein. In the action for an injunction of a zoning violation, the CNO is not required to show irreparable injury, only the violation of a valid ordinance by the defendant. Irreparable injury is not a prerequisite for an injunction when the law specifically affords that remedy, La.Code Civ.Proc. art. 3601, or when the conduct sought to be restrained is unconstitutional, South Central Bell Tel. Co. v. Louisiana Pub. Serv. Com'n., 555 So.2d 1370 (La.1990), or unlawful. Quachita Parish Police Jury v. American Waste & Pollution Control, 606 So.2d 1341 (La.App. 2nd Cir.), writ denied, 609 So.2d 234 (1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2339, 124 L.Ed.2d 249 (1993); Hudson v. City of Baton Rouge, 372 So.2d 1240 (La.App. 1st Cir.1979); Smith v. West Virginia Oil & Gas *254 Co., 365 So.2d 269 (La.App. 2nd Cir.1978) rev'd on other grounds, 373 So.2d 488 (1979); Apex Oil Co. v. City of Port Allen, 357 So.2d 624 (La.App. 1st Cir.), writ denied, 358 So.2d 632 (La.1978). See also 4 Anderson, supra § 29.09 n. 38; Note, The Injunction  A Method of Zoning Enforcement, 15 Syracuse L.Rev. 548 (1963-64).
Applying the foregoing constitutional and legal precepts to the case at hand, we conclude that the petition of the CNO states a valid cause of action for declaratory and injunctive relief. The petition alleges that the OLD violated several valid CNO ordinances in connection with the construction, maintenance, and occupancy of a marina and related developments at South Shore Harbor. Specifically, the ordinances required OLD to obtain prior to construction a permit for use of the land for a marina and a permit for the particular buildings to be erected, and another ordinance required the OLD to allow inspections by city officials during construction. The petition further alleges that the OLD violated these regulations by beginning and continuing construction without the required permits and without allowing the required inspections. The petition seeks declaratory relief and a preliminary injunction to prevent the OLD from continuing present construction or commencing new construction at the marina without complying with all city ordinances relative to land use, zoning, building, and safety regulations. The petition does not include any allegation revealing that there is some insuperable bar to this relief. That is, the allegations fail to demonstrate that the CNO clearly does not have a cause of action or that the OLD has an affirmative defense that appears clearly on the face of the pleadings.
The enactment and enforcement of zoning and building ordinances by the CNO to regulate the OLD's use and development of land within the city does not appear to be inconsistent with the 1974 Constitution in any respect. For example, there is no indication on the face of the pleadings that the enforcement of the ordinances will cause an abridgement of the police power of the state under Article VI, § 9(B). First, there does not appear to be any conflict between the CNO ordinances and the enabling act under which the OLD is proceeding to develop land within the city. The enabling laws authorize the OLD to perform two different but related functions: (1) Construction of levees and seawalls; and reclamation of marshlands and lakebottom in connection with flood protection, La.R.S. 38:307(A)(1); and (2) Commercial, residential, and recreational development of the reclaimed land to financially assist levee and seawall construction. La. R.S. 38:307(C)(1), 38:336(A). Under the allegations of the petition in the present case, the CNO does not seek to enforce zoning and building ordinances to regulate the OLD's primary function of levee construction, flood protection, and marsh or lakebottom reclamation. Nor do the pleadings clearly show that enforcement of the zoning and building ordinances conflict with the state statute that authorizes the OLD to undertake commercial, residential, and recreational development of land within the city. The allegations of the petition fail to disclose any reason that the objects of the statute and the ordinances cannot be harmoniously brought about. Second, assuming arguendo that the city zoning and building ordinances could be said to conflict in some way with the state statute, it does not clearly appear on the face of the pleadings that: (1) the law authorizing the OLD to conduct commercial and recreational land development operations within the CNO is necessary to the protection or promotion of the vital interests of the state as a whole; or that (2) there are no means significantly less detrimental to home rule autonomy by which the state objective could be accomplished. Therefore, the OLD's exception of no cause of action regarding the enforcement of the CNO's zoning and building ordinances should have been overruled.
When this case is remanded for further proceedings in the trial court, however, the OLD will be afforded the opportunity to plead and prove any good faith defense on the merits. This may include a non-frivolous defense, based on additional facts not urged in the petition, showing that the CNO has exercised home rule or police power so as to cause an abridgement of the police power of the state or other conflict with the constitution according to the precepts set forth in *255 this opinion; has violated well settled principles governing the exercise of the police power, See e.g., Francis v. Morial, 455 So.2d 1168 (La.1984); or has exercised its zoning power in an unreasonable, oppressive, arbitrary, or discriminatory manner, See, e.g., Four States Realty Co., Inc. v. City of Baton Rouge, 309 So.2d 659 (La.1975); Plebst v. Barnwell Drilling Co., Inc., 243 La. 874, 148 So.2d 584 (1963); 6 Rohan, Zoning and Land Use Controls § 35.04 (1991). No such defense appears on the face of the pleadings or has been suggested by the record before us. This comment is added only to clarify the posture of the case so as to assist the parties and the trial court in disposing of the matter.

D. DISTINCTION AND REFUTATION OF OTHER OPINIONS AND ARGUMENTS
The Court of Appeal in the present case decided that the CNO has no authority to require the OLD to comply with its zoning and building ordinances. That court concluded that Article VI, § 9(B) of the 1974 state constitution reserves to the legislature the authority to enact laws on any "matter of legitimate state concern" and, in effect, limits the CNO's home rule powers of initiation and immunity to "affairs of local concern" or "purely local affair[s]." City of New Orleans v. Board of Com'rs, 612 So.2d 318, 321 (La. App. 4th Cir.1993). The Court of Appeal erred in interpreting Section 9(B) and in essence applied the outmoded "state-local" test that was rejected by the drafters and ratifiers. As has been observed, Section 9(B) was adopted as a principle of harmonizing local home rule power and state police power by reserving to the legislature a residuum of authority to supersede otherwise constitutionally valid home rule laws only when necessary to protect or promote the health, safety, and welfare of the people as a whole. The drafting history clearly indicates that "state-local," "statewide concerns," and other such tests were rejected because they had led to undue judicial deference to legislative intervention in other states. The Court of Appeal's construction would defeat this purpose and relegate home rule abilities and immunities to matters which courts find to be "local" or "purely local." We think it clear the drafters wished to avoid the situation that had occurred in other states where courts interpreted the state-local test with too much deference to the legislature. The clear intention of the convention and the public was to strengthen the home rule powers to the fullest extent possible while reserving to the state the power necessary to protect the vital interests of the whole people.
The Court of Appeal was influenced by City of New Orleans v. State, 364 So.2d 1020 (La.1978) in which this court set forth an early, unnecessary, and erroneous analysis of the relationship between local home rule authority and state police power. In that case this court dismissed the CNO's suit to have the state enjoined from using Jackson Barracks as a correctional facility in violation of zoning ordinances. Although the same result could have been reached on prescription and mootness grounds, the majority justified its decision with an ill advised constitutional interpretation that the "municipal police power is subordinate to that retained by the State as sovereign." Id. at 1023. The majority's opinion, in effect, interprets Article VI, § 9(B) as stripping home rule municipalities and parishes of all their powers of immunity, relegating them to a rank of creaturehood more lowly than the status they enjoyed under the 1921 constitution, and reserving to the legislature the power to substitute its judgment for that of the home rule governments on any subject properly encompassed within the definition of police power. The interpretation is simply wrong and has been subject to cogent judicial and scholarly criticism. City of New Orleans, 364 So.2d at 1023-24 (Marcus, J. dissenting); Murchison, Work of Appellate Courts  1978-1979: Local Government Law, 40 La.L.Rev. 681, 706-10 (1980).
As has been observed, the text of the constitutional provisions and their drafting history clearly indicate that the drafters and ratifiers intended to emancipate home rule governments as fully as possible, not to return them to subjugation under the Dillon rule. Subsequent to City of New Orleans v. State, 364 So.2d 1020 (La.1978) our cases have recognized clearly that Article VI of the *256 1974 Louisiana Constitution promotes rather than weakens the autonomy of home rule entities. Francis v. Morial, 455 So.2d 1168 (La.1984); City of Shreveport v. Kaufman, 353 So.2d 995 (La.1978); City of New Orleans v. State, 426 So.2d 1318 (La.1983) (concurring opinion). Accordingly, the majority opinion in City of New Orleans v. State, 364 So.2d 1020 (La.1978), which was already undermined, is disapproved to the extent that it is inconsistent with the present opinion and other decisions of this court.
Relying primarily on City of New Orleans v. State, 364 So.2d 1020 (La.1978), the OLD urges us to apply one or a combination of three tests to resolve the present controversy: the eminent domain test, the superior sovereignty test, and the governmental-proprietary test. These tests provide that an intruding government that has the power of eminent domain, or is higher in the governmental hierarchy, or is exercising a governmental function, is granted judicial immunity from zoning ordinances unless there is an express legislative directive to the contrary. 6 Rohan, supra, §§ 35.05, 40.03[1][b]; 2 Anderson, supra, § 12.06-.07; Note, Governmental Immunity from Zoning, 22 Boston Coll.L.Rev. 783, 784 (1981); Note, Governmental Immunity from Local Zoning Ordinances, 84 Harv.L.Rev. 869, 870 (1971). However, the OLD can not point to any constitutional provision in support of its contention that these tests should be applied to resolve the present controversy. On the contrary, under the Local Government Article of the 1974 Louisiana Constitution these tests may not be applied to resolve a controversy which arises when a state agency or governmental subdivision attempts to use or develop land within the boundaries of a home rule local government entity without complying with the municipal zoning ordinances and administrative requirements. The tests the OLD relies upon are judge-made rules created primarily by courts using their common-law powers to deal with such conflicts in jurisdictions having no explicitly controlling statutes or constitutional provisions. See Anderson, supra; Note, Governmental Immunity from Zoning, supra, at 784-85. In contrast, in Louisiana the 1974 Constitution grants the CNO and the other preexisting home rule governments authority to enact and enforce zoning ordinances as part of the police powers and home rule powers delegated to them. Additionally, Louisiana is one of the few states which specifically gives local governmental bodies the authority to zone by constitutional provision. La. Const.1974, Art. VI, § 17; 6 Rohan, supra, § 35.03[2]. Neither Article VI nor the convention debates evince any intent to exempt the state's use of its property from the harmonizing principle contained in Section 9(B) or to recognize any exception thereto based on the common-law rooted tests. Consequently, the courts of this state are required to analyze and apply the relevant state constitutional provisions in deciding conflicts between state use of its land within home rule municipalities and constitutionally authorized local zoning ordinances. La. Const.1974, art X, § 30; Cf. State v. Perry, 610 So.2d 746, 750-751 (La.1992). They are not at liberty to borrow and apply judge made rules in disregard of our fundamental law or to reweigh balances of interests and policy considerations already struck by the framers of the constitution and the people who ratified it. Additionally, these traditional common-law tests have been extensively criticized and rejected by many courts in other jurisdictions as being an overly simplistic solution to multifaceted conflicts through the application of artificial labels rather than reasoned adjudication. City of Fargo v. Harwood Twp., 256 N.W.2d 694 (N.D.1977); City of Temple Terrace v. Hillsborough Ass'n for Retarded Citizens, 322 So.2d 571 (Fla.App. 2nd Dist.1975), affirmed, 332 So.2d 610 (Fla.1976); Rutgers, State Univ. v. Piluso, 60 N.J. 142, 286 A.2d 697 (1972); St. Louis County v. City of Manchester, 360 S.W.2d 638 (Mo.1962); Rohan, supra, § 40.03[1][b]; Note, Governmental Immunity from Zoning, supra; Note, Governmental Immunity from Local Zoning Ordinances, supra.
The holdings of all other prior decisions of this court are consistent with our rationale and conclusions in the present case. The dicta and minority opinions in some of our prior cases contain statements that are to varying degrees inconsistent with the present opinion or that fail to recognize fully the *257 principles articulated herein. In Francis v. Morial, 455 So.2d 1168, 1171-74 (La.1984) the rationale, although consistent with the present opinion, fails to recognize clearly Article VI, § 9(B)'s principle of harmonizing local autonomy with state police power. Also, in Francis v. Morial, supra, at 1169, Shreveport v. Kaufman, 353 So.2d 995, 997 (La.1978), and Polk v. Edwards, 626 So.2d 1128, 1142-43 (La.1993) we failed to notice that the legislature cannot by a general law deny the exercise of a home rule power retained by Article VI, § 4 as it can the exercise of a home rule power assumed under Sections 5 and 7 of that article. But that deficiency in each case was not essential to the holding and therefore may be disregarded as dicta. By the same token, the aspects of City of New Orleans v. State, 426 So.2d 1318 (La.1983) discussed earlier in this opinion should not have precedential effect with respect to the crucial issues in the present case.

CONCLUSION
For the reasons assigned the judgment of the trial court sustaining the exception of no cause of action, and the judgment of the Court of Appeal affirming the trial court's judgment, are reversed. The exception is overruled. The case is remanded to the trial court for further proceedings according to law and consistent with this opinion.
REVERSED AND REMANDED TO THE TRIAL COURT.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
The Orleans Levee District is a constitutionally authorized entity. It is a political subdivision of the State. LSA-R.S. 38:281(6). As a local governmental subdivision of the State, the Orleans Levee District is subject to general legislation enacted under the State's police power. The State's plenary authority precludes Orleans Levee District zoning regulation by the City of New Orleans. City of New Orleans v. State, 426 So.2d 1318 (La.1983). The City of New Orleans' zoning authority does not extend to the land under the control of the Orleans Levee District.
I respectfully dissent.
NOTES
[*] LEMMON, J. not on panel. Rule IV, part 2, § 3.