1 PLOTKIN, Judge.
The sole issue in this appeal is whether two trial court judges properly granted exceptions of no cause of action dismissing the plaintiffs’ suits against defendant Bass Production Co., the mineral lessee on property that was recently returned to the plaintiffs by defendant Orleans Levee Board (OLB). For the reasons that follow, we affirm.

Facts

This controversy arises out of the interpretation of Act 233 of 1984 and its amendments, Act 819 of 1985 and Act 847 of 1992, that ordered OLB to return to former owners or their successors land expropriated and purchased under threat of expropriation during the late 1920’s to construct a spillway at the site of the former Bohemia Plantation, 50 miles downriver from New Orleans on the east bank of the Mississippi River. The original 1984 act declared that the public purpose for taking the property expropriated for that project had ceased to exist, as authorized by a 1973 Louisiana Constitutional act.
The plaintiffs in these two casés, which have been consolidated for appeal, are successful applicants who were declared owners of the property and given quitclaim deeds to the property between 1991 and 1993, following an application and certification process that began on April 1,1987. The two groups of plaintiffs each filed a “Petition for ^Declaratory and Money Judgment” against OLB and Bass seeking mineral royalties paid by Bass to OLB during the “interim period” between the effective date of Act 233 of 1984 and the dates on which Bass began to pay royalties to the landowners after they received quitclaim deeds to the property. Bass filed exceptions of no cause of action and prescription. Two different trial court judges granted the exceptions of no cause of action, but not the exceptions of prescription. The landowners appealed the granting of the exceptions of no cause of action. Bass answered the appeals, asking this court to consider the exceptions of prescription, in the event we decide to reverse the granting of the exceptions of no cause of action. The appeals were consolidated by this court. Analysis
This appeal is hotly contested; the plaintiffs filed an extensive brief in which they assigned eight reasons why they believe the trial eourt judges improperly granted the exceptions of no cause of action in favor of Bass. Both Bass and the OLB filed extensive briefs answering all of the plaintiffs’ arguments, claiming that the trial judges properly granted the exceptions of no cause of action. The parties suggest that the question to be answered in determining the controversy is whether Act 233 of 1984 was self-operative, in which case the plaintiffs gained ownership rights in the property oh the effective date of the act (June 29, 1984), or whether the act became operative only through an application and certification procedure designed and implemented by the Department of Natural Resources (DNR), in which ease the landowners gained no ownership rights in the property until after the completion of that process, which determined their rights to the property.
However, we see the issues in this particular appeal much more simply. Bass claims that it could not be liable to the plaintiffs-for the mineral royalties because it has already paid those royalties to OLB pursuant to its lease contract; thus, the plaintiffs have no cause of action against Bass.
The Louisiana Supreme Court recently explained as follows:
The purpose of an exception of no cause of action is to determine the sufficiency in law of the petition. The exception is triable on the face of the papers and for the purposes of ^determining the issues raised by the exception, the well pleaded facts in the petition must be accepted as true.
City of New Orleans v. Board of Commissioners, 93-0690, p. 2 (La. 7/5/94), 640 So.2d 237, 241 (citations omitted). The court also explained the standard for granting an exception of no cause of action as follows:
The burden of demonstrating that no cause of action has been stated is upon the *1251 mover or exceptor. In deciding the exception of no cause of action, the court must presume all factual allegations of the petition to be true and all reasonable inferences are made in favor of the non-moving party. In reviewing a trial court’s ruling sustaining an exception of no cause of action, the court of appeal and [the supreme] court should subject the case to de novo review because the exception raises a question of law and the lower court’s decision is based only on the sufficiency of the petition.
In appraising the sufficiency of the petition we follow the accepted rule that a petition should not be dismissed for failure to state a cause of action unless it appears beyond doubt that the plaintiff can prove no set of facts in support of any claim which would entitle him to relief. The question therefore is whether in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the petition states any valid cause of action for relief. The petition should not be dismissed merely because plaintiffs allegations do not support the legal theory he intends to proceed on, since the court is under a duty to examine the petition to determine if the allegations provide for relief on any possible theory.
As a practical matter, an exception of no cause of action is likely to be granted only in the unusual case in which the plaintiff includes allegations that show on the face of the petition that there is some insuperable bar to relief. In other words, dismissal is justified only when the allegations of the petition itself clearly demonstrate that the plaintiff does not have a cause of action, or when its allegations indicate the existence of an affirmative defense that appears clearly on the face of the pleading.
Id. at p. 28-29, 640 So.2d at 253 (citations omitted).
Thus, in the instant case, this court is required to make a de novo review of the plaintiffs’ petitions to determine whether the facts alleged, accepted in the fight most favorable to them, and with every doubt resolved in their behalf, are sufficient to support a cause of action against Bass under any legal theory of recovery.
In their petitions,[1] the landowners asserted, in pertinent part, as follows:
IX.
I4AS of June 29, 1984, the effective date of Act 233 of 1984, the Levee Board was divested of any interest in the Property, and the Landowners became vested with all rights to the Property, including mineral production therefrom, and a right to receive a title to the property subject to the outstanding Bass mineral lease.
X.
The Landowners seek a declaratory judgment decreeing that all rights mineral [sic] and other royalty interest in the Property that was expropriated or purchased under the threat of expropriation became theirs or their predecessors as of June 29, 1984, the effective date of Act 233 of 1984.
[[Image here]]
XIII.
In the intervening years between the time that the Legislature granted the Landowners ownership of the Property and rights to the revenues and other income therefrom and the time that the Acts of Transfer were actually passed, the Levee Board continued to receive, and Bass continued to pay to it, royalties from the oil and gas production of the Property.
⅜ ⅜ ⅜ ⅜ ⅜ ⅝
XVI.
As of June 29, 1984, it was Bass’s obligation to cease remitting to the Levee Board any revenues attributable to the Property, since the Levee Board no longer had any interest in the Property, and to either retain those revenues until the proper recipient could be determined, to escrow those revenues with the DNR, or to convoke a concursus *1252 proceeding to determine the rightful owner of the revenues.
XVII.
Thus, the Levee Board has collected, and Bass has paid, vast sums in mineral royalties from the production of oil and gas attributable to the Property since June 29, 1984, even though on that date, the Levee Board was divested of any interest in the Bohemia Spillway and thus lost all rights to such mineral production.
XVIII.
Bass is indebted to the Landowners for the entire amount of the revenues it generated under the mineral lease by way of royalties and any other amounts plus damages and interest from June 29, 1984 until the date the correct revenues were paid to the Landowners, as well as any monies illegally paid to the Levee Board from Production or other generated funds attributable to the Property from June 29, 1984, through the date that Bass finally began paying royalties to the Landowners.
' XIX.
Written demand upon Bass was made by the Landowners on March 11, 1993, and again on April 2, 1993, to pay the past due royalties in compliance with Louisiana law, which demand Iswas refused by Bass in a letter to landowners’ counsel dated April 5, 1993.
XX.
The Levee Board is indebted to the Landowners to return the amount of revenue that it erroneously received from Bass from production attributable to the Property from June 29, 1984, through the date Bass finally began paying royalties to the Landowners.
XXI.
The Landowners are entitled to an accounting from Bass and the Levee Board of all revenues generated under the mineral lease covering the Property from June 29, 1984, until the date that Bass began paying to the Landowners some of the royalties to which they were entitled. The Landowners are further entitled to a full accounting from June 29, 1984, to the date of judgment of the amounts actually paid to the Levee Board on an acre basis, and to a further accounting of the calculations and payments of royalties as to their validity and correctness.
(Emphasis added.)
As noted, the parties would have this court decide, on this exception of no cause of action, whether ownership rights in the property passed to them on June 29, 1984 (the date Act 233 of 1984 became effective) or when the quitclaim deeds were actually transferred to the landowners during 1991, 1992, and 1993. However, for purposes of determining this exception only, we will simply assume, without deciding, that the plaintiffs’ allegations are true and that they gained ownership rights in the property when Act 233 of 1984 became effective on June 29, 1984. The relevant inquiry for this court then becomes whether the above-recited allegations in the landowners’ petitions are sufficient to state a cause of action against the mineral lessee, Bass, under any legal theory of recovery, assuming that the property was transferred to the landowners on June 29, 1984.
The pertinent portion of Act 233 of 1984 for determining the responsibility of Bass concerning the payment of mineral royalties during the interim period are sections 3 and 5, which provide as follows:
Section 3. The Board of Levee Commissioners of the Orleans Levee District shall provide a thorough accounting to the secretary of the Department of Natural Resources, or his designee, concerning all revenues received from the affected property. The information so provided shall be made available to applicants. The board shall comply with the spirit and letter of the rules and regulations adopted and promulgated by the secretary of the Department of Natural Resources.
Jl******
*1253 Section 5. The return of property by the board to the owners or their successors shall be subject to all servitudes and rights-of-way, whether acquired by expropriation or otherwise, or surface or mineral leases, or other valid contracts executed by or with the board prior to the effective date of this Act. Any deed whereby any property is returned shall state that such property is subject to such rights. Any party to a contract in effect on the effective date of this Act with the board concerning property affected by this act shall be entitled to make payments and give all notices required or permitted under such contract to the secretary until the title to the property affected has been transferred. When such contracts provide for renegotiation of rent between any person and the board, or provide that any person may seek approval by the board, such person shall be entitled to renegotiate such rent or to seek and obtain such approval from the secretary until the title to the property affected has been transferred. Any sum deposited with the secretary pursuant to this Act which represents rent, royalty or other sum attributable to land being returned, shall be paid by the secretary to the appropriate persons.[2]
(Emphasis added.)
The landowners claim that the highlighted portion of section 5 quoted above created a responsibility on the part of Bass do one of three things: “to either retain those revenues until the proper recipient could be determined, to escrow those revenues with the DNR, or to convoke a concursus proceeding to determine the rightful owner of the revenues.” See Petitions, paragraph XVI. They claim that Bass made a “calculated gamble” when it chose not to take advantage of section 5 and instead elected to continue to pay the royalties to OLB even after the effective date of Act 233 of 1984.
Bass claims, on the other hand, that the above-quoted sections of Act 233 of 1984, when read together, created two options for transferring the mineral royalties “received from the property” to the landowners, assuming that ownership passed immediately on June 29,1984. Bass claims that section 3 placed the primary responsibility for transferring the funds on OLB, by requiring OLB to “provide a thorough accounting ... concerning all revenues received from the affected property” to the secretary of the DNR. Section 5, Bass claims, simply created an alternative method for transferring the funds, “entitling,” but not requiring, Bass to make payments to the secretary of the DNR, rather than the OLB, and allowing the ^secretary to then pay the monies to the “appropriate persons.” Based on this interpretation, Bass argues that it cannot be hable twice for the same monies when it properly elected to continue to make payments to OLB, which was the obligee under its contract, because Section 3 gave Bass the right to continue to make the payments in that manner.
The highlighted portions of Section 3 require that the OLB “provide a thorough accounting ... concerning all revenues received from the affected property.” Although we acknowledge the possibility that other forms of revenue besides mineral royalties might conceivably be derived from the property in question, the record in this case indicates that the “revenues” at issue here and which are subject to Section 3 of Act 233 of 1984 are mineral leases and royalties. Thus, Section 3 would be meaningless if this court interpreted Section 5 to require that Bass pay the mineral royalties to the secretary of the DNR, as the landowners would have us do. Because OLB was required to provide the accounting, the legislature obviously contemplated that mineral lessees could properly elect to continue to make payments to the OLB during the interim period between the effective date of June 29, 1984 and the date the quitclaim deeds were transferred to the landowners who are plaintiffs herein.
Section 5, on the other hand, specifically provides that parties involved in a contract with the OLB on the effective date of the act “shall be entitled to make payment” to the secretary of the DNR. Certainly that lan *1254 guage cannot logically be interpreted to require Bass to make payments to the DNR secretary, rather than to the OLB, even considering the language of the section in the light most favorable to the landowners and resolving every doubt in the landowners’ behalf. See City of New Orleans, 93-0690 at 28, 640 So.2d at 253. In choosing that language, the legislature could not have intended to impose a requirement that Bass make payment to the secretary when it specifically stated that Bass was only “entitled” to do so.
Reading Séction 3 and Section 5 of Act 233 of 1984 together, we find that Bass made a legitimate choice in electing to continue to pay its mineral royalties to the OLB during the interim period, as contemplated by Section 3 of the act, rather than making payments to the secretary of the DNR, as allowed by Section 5. Because Bass made a legitimate choice |8between options supplied by the act, it appears beyond doubt that the landowners in this case can prove no set of facts in support of any claim that would entitle them to relief against Bass. Thus, the trial court’s granting of the exception of no cause of action was proper under the standards established in City of New Orleans.
Because determination of the other issues raised by the parties in this appeal is unnecessary to deciding the propriety of the granting of the exceptions of no cause of action, we pretermit discussion of the other issues. We note specifically that nothing in this opinion shall be construed to determine the question of when the landowners gained ownership rights in the property, because determination of that issue is unnecessary to the question before us.
Accordingly, the trial court’s judgments granting the exceptions of no cause of action in favor of defendant Bass are affirmed.

AFFIRMED.

. The petitions filed by the two different groups of landowners are identical in the quoted parts.

. Section 5 was amended by Act 819 of 1985 to delete any reference to rents and royalties.