Dear Representative Landrieu:
You have submitted an opinion request asking this office to address a number of issues regarding the Orleans Levee District (OLD), The FloodComm Corporation and the lease entered into by FloodComm Corporation with LeveeComm of Louisiana, L.L.C. (LeeveeComm), a for-profit limited liability company, for the stated purpose of installing a fiber optic network in the levee system, operated by OLD, as a means of flood control. We address each issue raised in the order presented in your request.
1. Dual Officeholding.
 A. Is membership on the Board of Directors of ("apublic benefit corporation" created by the Levee Commissioners ofthe Orleans Levee District) an appointive office as provided inR.S. 42:62(2) relative to dual officeholding?
"Appointive office" for purposes of dual officeholding is defined by LSA-R.S. 42:62(2) as follows:
 (2) "Appointive office" means any office in any branch of government or other position on an agency, board, or commission or any executive office of any agency, board, commission, or department which is specifically established or specifically authorized by the constitution or laws of this state or by the charter or ordinances of any political subdivision thereof and which is filled by appointment or election by an elected or appointed public official or by a governmental body composed of such officials of this state or of a political subdivision thereof.
It is unnecessary to answer this question as we conclude, hereinbelow, that LSA-R.S. 42:64(A)(1) prohibits the simultaneous holding of the positions of Orleans Levee District board member and FloodComm Board of Directors member because these two positions, whether defined as employment or appointive office, are incompatible.
B. Is membership on the FloodComm Corporation boardand the Levee Board prohibited by the dual Officeholding laws,particularly prohibitions on holding incompatible offices asprovided in LSA-R.S. 42:64?
LSA-R.S. 42:64 prohibits dual-officeholding/employment where the incumbent of one of the offices appoints incumbents to the other office. Only the first
(underscored) clause of § 64A(1) applies to the Orleans Levee District. There is no specific prohibition in the Dual Officeholding section (LSA-R.S. 42:63) that would prohibit a member of OLD, a political subdivision, from holding another part-time appointive office in the same political subdivision. (See: LSA-R.S. 42:63E). However, there is a problem presented by LSA-R.S. 42:64 relative to incompatible offices.
§ 64. Incompatible offices
 A. In addition to the prohibitions otherwise provided in this Part, no other offices or employments shall be held by the same person in combination if any of the following conditions are found to pertain and these prohibitions shall exist whether or not the person affected by the prohibition exercises power in conjunction with other officers:
 (1) The incumbent of one of the offices, whether or not in conjunction with fellow officers, or employment has the power to appoint or remove the incumbent of the other, except that local governmental subdivisions may appoint members of the governing body to boards and commissions created by them and over which they exercise general powers as provided in Article VI, Section 44 of the Constitution of Louisiana. A board or commission so created may elect officers from its own membership, and if a joint commission of two parishes, except a joint commission that has as its function the operation and maintenance of a causeway and its related roadways, may also appoint a member of one of such parish's governing body to be its general superintendent. (Emphasis added.)
This section generally prohibits the members of a governing board from appointing themselves to a board over which the "parent" board has appointive power. The exception contained in LSA-R.S. 42:64(A)(1) does not apply to the instant situation. The exception applies to a local governmental subdivision as defined in Article VI, Section 15, of the Louisiana Constitution. Article VI, Section 44(1) of the Constitution defines a "local governmental subdivision" as a parish or a municipality. Paragraph 2 of that section indicates that a special district, such as OLD, is a "political subdivision", rather than a local government subdivision. Thus, the exemption does not apply.
Therefore, because the exception does not apply to the OLD it cannot appoint its members to a board over which it has the power of appointment. The exemption applies only to parish governing authorities, such as police juries and municipal councils. In this case OLD has the power to appoint the membership of FloodComm's board of directors and, in fact, did appoint some of its own members. Such appointment is a violation of LSA-R.S. 42:64A.
C. Because of the powers and the duties invested inthe public benefit corporation by the Levee Board and becauseboth of those offices are held in some instances by the sameperson are those offices "incompatible offices" adverse to thepublic interest pursuant to LSA-R.S. 42:61. etseq.
As discussed above, it is our opinion that the offices are incompatible under the terms of LSA-R.S. 42:64(A)(1), and as such, would be violative of the legislative policy as set forth in LSA-R.S. 42:64(A)(1).
2. Procedure for Lease
 A. Attorney General Opinion 94-442 states that LSA-R.S.41:1215 establishes certain criteria for negotiation of thelease of public lands by public benefit corporation which aresubject to the exemption contained therein. Specifically, itrequires that such a lease be ". . . negotiated and let inaccordance with objective criteria relating to a balance offactors including but not limited to highest rent or highestpercentage of gross profits, quality control of products,financial stability, architectural design, uniqueness ofoperation, and overall economic importance to the primaryobjective of stimulating other industrial or commercial activitywithin such development."
 (1) Has such a lease been entered into?
 (2) Does the cited language contemplateconsideration of more than one bid or proposal?
In responding to your inquiries regarding the criteria for the negotiation of leases if public lands by public benefit corporations we direct your attention to Attorney General Opinion 94-442 and advise that to the extent that Opinion 94-442 is in conflict with this Opinion, the provisions of this Opinion shall control, and Opinion 94-442 shall be considered to be superseded hereby.
Title 41 of the Louisiana Revised Statutes governs operations on public lands. Chapter 10, and particularly Part I relate to "Leases of Public Lands". Section 1212 G and 1215 B(4) both relate to leases of lands by public benefit corporations. At first reading these two sections seem to create two different standards for the granting of leases by public benefit corporations. Actually, however, the general standard is set forth in Section 1215 B(4) and an exception to the general standard is set forth in Section 1212 G for public benefit corporations formed by political subdivisions with a population in excess of 475,000. The standard that must be complied with by the OLD is found at Section 1212 G, not at Section 1212 B(4).
An analysis of the statutory structure and the historical development of Sections 1212 and 1215 supports our conclusion that Section 1212 G is the controlling provision as relates to the Orleans Levee District. Part I of Chapter 10 of Title 41 is title "PART I. LEASES FOR GENERAL PURPOSES of CHAPTER 10 PUBLIC LANDS".
The Sections of Part I. are as follows:
Section
1211. Lessor defined
1212. which may be leased; purposes; leases of section lands for agricultural purposes; negotiation of leases of school lands; negotiation of leases of certain public benefitcorporations; negotiation of leases for administering buildings designated as historic landmarks. (Emphasis supplied.)
1213. Application for lease. (Emphasis supplied.)
1214. Advertisement and bids. (Emphasis supplied.)
1215. Opening of bids; execution of leases; exceptions; public benefit corporations. (Emphasis supplied.)
LSA-41:1215 B(4) originally provided as follows:
 "Nonprofit corporations which meet the requirements of a public benefit corporation as set forth herein and which own, lease, sublease or control immovable property shall not be bound by the requirements set forth in Paragraph A hereof, provided that any lease or sublease entered into by and between such nonprofit corporation and a third party be approved by the governing body of such political subdivision on behalf of which the corporation exercises its powers; provided further that such leases or subleases be negotiated and let in accordance with objective criteria relating to a balance of factors including, but not limited to, highest rent or highest percentage of gross profits, quality control or products, financial stability, architectural design, uniqueness of operation and overall economic importance to the primary objective of stimulating other industrial or commercial activity within such development;"
Section 1215 B(4) was apparently added in response to the decision in State ex rel. Cuccia v. French MarketCorporation, 334 So.2d 241 (La.App. 4th Cir. 1976) where the court held that the Public Lease law applied to the French Market Corporation, a private, nonprofit corporation that derived its power to lease from the City of New Orleans. The French Market Corporation found it was not able to compete in the private sector and through the City of New Orleans pushed for legislation that allowed it to accept leases at less than the highest bid.
Section 1212 G was added in 1981. The legislative history indicates that the French Market Corporation realized that it did not have to accept the highest bid (under 1215 as it then existed) but wanted to dispense with the requirement to advertise for and accept bids, as well, and wanted to be able to negotiate with each tenant on a case by case basis.
LSA-41:1212 G, as added in 1981, provides as follows:
 "Whenever a public benefit corporation formed by a political subdivision of the state of Louisiana with a population in excess of 475,000, through it chief executive officer for the purpose of developing and operating properties owned by it, leases any land owned by it, such public benefit corporation shall not be required to advertise for and receive bids as hereinafter provide for this Part for other leases, provided, however, that such lease entered into shall provide for a fair and equitable return of revenue to said public benefit corporation." (Emphasis supplied.)
Section 1212 provides a further exception to the 1215 B(4) exception for public benefit corporations formed by political subdivisions with populations in excess of 475,000. This provision eliminated the requirement to advertise and receive bids and created a separate standard for leases entered into pursuant to Section 1212: "Such leases entered intoshall provide for a fair and equitable return of revenue to saidpublic benefit corporation or political subdivision." The fact that the amendment to 1212 was later in time, and that it was placed earlier in the statute (prior to Section 1214 setting forth the advertising and bidding requirements) indicates the redactor's intent to provide an exception from the requirements and bidding, something Section 1215 (as originally enacted) did not do. Section 1215 required an "objective criteria" and "balance of factors" test be used to analyze lease proposals. This is an appropriate standard for leases awarded under Section 1215 because under the original Section 1215, bids were still required and the "objective criteria" could be used to analyze each of the bids. However, under Section 1215 G, advertisements and bids were not required. Therefore, the redactors of Section 1212 G had to create a new standard, the "fair and equitable return of revenue" standard, for the review of leases entered into under Section 1212 G, where there was the possibility of negotiating with only one potential tenant. In analyzing a lease, entered into under Section 1212 G, where there may not be competition between prospective lessees, the redactors created a standard that allowed the lease to be analyzed as a single "offer to lease" so long as the lease provided for a fair and equitable return of revenue.
Section 1212 G, which is only applicable to the specific public benefit corporations defined therein (including FloodComm Corporation), renders Section 1215 B(4) inapplicable in this instance, because Section 1215 B(4) is a general provision superseded by a specific provision. Salter v. State ThroughDept. of Health and Human Resources 612 So.2d 163
(La.App. 1st Cir. 1992).
Article VI, Section 44(2) of the Louisiana Constitution indicates that a special district, such as Orleans Levee District, is a "political subdivision". The Orleans Levee District encompasses the Parish of Orleans:
LSA-R.S. 38:291. . . .
"K. Orleans Levee District. (1) The parish of Orleans is formed into a public levee district, to be know as the Orleans Levee District. These lands and all property thereon situated, not exempt from taxation, shall be subject to the provisions of this Chapter."
The population of the Parish of Orleans in July of 1994 (Louisiana Tech University) was 488,582 and in excess of 475,000. Clearly, the provisions of LSA-41:1212 G apply to leases granted by a public benefit corporation formed by the Orleans Levee District.
It is interesting to note that LSA-41:1215 B(4) was changed in 1991. It now provides as follows:
 "Nonprofit corporations which meet the requirements of a public benefit corporation as set forth herein and which own, lease, sublease or control immovable property shall not be required to advertise for and receive bids as provided for this Part, provided that any lease entered into by and between such nonprofit corporation and third party be approved by the governing body of such political subdivision on behalf of which the corporation exercises its powers. Such leases or subleases [shall] be negotiated and let in accordance with objective criteria relating to a balance of factors including but not limited to stability, architectural design, uniqueness of operation, and overall economic importance to the primary objective of stimulating other industrial or commercial activity within such development." (Emphasis supplied.)
As noted above, until 1991 the underscored language in the third line of Section 1215 B(4) above read as follows: "Non-profit corporations . . . shall not be bound by the requirements set forth in Paragraph A hereof. . .". The reference to Paragraph A is a reference to the bid procedure and the requirement that the highest bid be accepted. In 1991, Section 1215 B(4) still required that the advertisement procedure be complied with. After the 1991 amendment, both the advertisement and bid procedure were eliminated from the requirements of Section 1215 B(4). Section 1212 and Section 1215 still differed, however, in that under Section 1215 B(4) an "objective criteria" standard involving a "balance of factors" test is required for accepting a contract, rather than the "fair and equitable return of revenue" standard set forth in Section 1212 G.
In summary, it is our opinion that the Orleans Levee District formed a public benefit corporation (FloodComm Corporation), and that FloodComm entered into a valid lease with LeveeComm of Louisiana, L.L.C., pursuant to the provisions of LSA-41:1212 G. Section 1212 G, not Section 1215 B(4), governs the procedure that the OLD was required to follow when entering into the lease. To enter into such a lease FloodComm was not required to advertise for bids for the lease nor enter into a competitive bid situation. There is no requirement that FloodComm negotiate with more than one prospective lessee. FloodComm must be satisfied that the lease entered into provides for a fair and equitable return of revenue to said public benefit corporation.
Under the terms of the OLD PBC Sublease and Right of Use Agreement entered into by and among OLD/LeveeComm Corporation (now FloodComm Corporation) and LeveeComm of Louisiana, L.L.C., FloodComm granted to LeveeComm the right to use a path four feet in width to install, operate, maintain and upgrade the equipment and plant of an advanced telecommunications system. In return for the grant, FloodComm is to receive a minimum monthly rental fee of $1,458.33 per month (the first 24 months of which have been received as an advance payment of $35,000) with the balance to be paid monthly beginning in the 25th month. FloodComm will also receive a percentage of LeveeComm's net operating income (as such term is defined in the Lease). FloodComm will receive 10% of the net operating income until LeveeComm has recovered its Capitalized Project Costs (as such term is defined in the Lease) at which time it will begin receiving 50% of the net operating income. On the face of the Lease there is nothing to indicate that the return to the Orleans Levee District is anything but "a fair and equitable return of revenue to [the] public benefit corporation."
3. Creation of a public benefitcorporation/authority/procedure; authority to lease.
 A. Is FloodComm a public benefit corporation ascontemplated by LSA-R.S. 41:1215(B)?
 B. Was FloodComm created pursuant to the generalnonprofit corporation law (rather than specific authority) by theLevee Board "through its chief executive officer"?
Your inquiries 3(A) and 3(B) address whether the creation of FloodComm was accomplished in compliance with LSA-R.S.41:1215(B). The statutory requirements concerning formation of a public benefit corporation are found in LSA-R.S. 41:1215(b), which state:
 B. For the purposes of this Part a "public benefit corporation" is defined to be a nonprofit corporation formed pursuant to the general nonprofit corporation law of the State of Louisiana, except those formed pursuant to specific constitutional or statutory authority, by a political subdivision of the State of Louisiana through its chief executive officer for the purposes of owning, leasing, developing, and operating properties owned by such political subdivision or by such public benefit corporation, including but not limited to planning, renovating, constructing, leasing, subleasing, managing, and promoting such properties, which activity is declared to constitute a public purpose . . .
In response to 3(A), we are not able to provide a comprehensive and analysis concerning FloodComm's creation, because to do so would require us to make various factual determinations which we are unable to make based upon the information provided to us. However, we have reviewed the Articles of Incorporation and the Bylaws of FloodComm. LSA-R.S.41:1215 limits the purposes of a "public benefit corporation" to the "owning, leasing, and developing of properties owned by [the political subdivision] or by the [public benefit corporation], including but not limited to planning, renovating, constructing, leasing, subleasing, managing, and promoting such properties, which activity is declared to constitute a public purpose . . . "The objects and purposes of FloodComm, as set forth in Article Two of its Articles of Incorporation, are so limited, as that provision states "the exclusive objects and purposes for which this corporation is formed are to engage in any lawful activity in which a nonprofit corporation . . . may engage, all in accordance with the directions received from its board of directors. The board of directors may state the mission of the corporation in the bylaws of the corporation." Section III of the Bylaws of FloodComm states the mission of the corporation to be the same as the objects and purposes stated in the Articles of Incorporation. We believe that the term "lawful activity" as used in the Articles must be read in connection with LSA-R.S. 41:1215
and that the OLD has the authority to form a public benefit corporation and that the public benefit corporation may lease land for the purpose of establishing and operating a fiber optic communication system that is within its statutory purpose. FloodComm cannot have powers greater than those mentioned in Section 1215. The activities that were entered into by FloodComm are lawful activities authorized under Section 1215, as more specifically delineated by Section 1212 B relative to lease procedures.
In response to 3(B), our review of FloodComm's Articles and Bylaws indicates that FloodComm was created pursuant to the general nonprofit corporation law, and not pursuant to any specific constitutional or statutory authority other than LSA-R.S.41:1215B. The resolution of the Levee Board dated June 15, 1994, further indicates that the chief executive officer of the Levee District, President Robert G. Harvey, was authorized to "proceed with the formation of a public benefit corporation to facilitate the development of the system."
C. Can the Levee Board appoint its own members asmembers of the board of this public benefit corporation andprovide that the terms of the members of the public benefitcorporation will extend beyond those of its members of the LeveeBoard? Is there legal authority for such action? Is such actiona subterfuge to circumvent the authority of subsequent members ofthe Levee Board and to usurp the powers of the Levee Board aslater may be constituted?
As discussed earlier, we are of the opinion that the Levee Board members may not legally appoint themselves as members of the Board of Directors of FloodComm because to do so would invoke the prohibition of LSA-R.S. 42:64 concerning incompatible offices.
Furthermore, we find that LSA-R.S. 42:3 applies to this situation and prevents the appointments to the FloodComm board from exceeding the term of office of the OLD members. That statute reads as follows:
§ 3. Limitation of terms of employees or officials elected by boards; exceptions
 The term of office of all employees are officials elected by any state, district, parochial or municipal board shall not be for a longer period of time than the term of office of the membership of the board electing them so that each respective board shall elect its own officers and employees. This Section does not apply to the officers or employees of any board governed by a civil service law of this state or of any parish or municipality thereof.
The members of the Board of FloodComm are officials appointed by the OLD, a governing board of a special district and as such, their terms of office cannot exceed the term of the membership of the OLD. The OLD members, with two exceptions, serve at the pleasure of the Governor. LSA-R.S. 38:291 K(2). The OLD named five of its own members to the Board of FloodComm for nine (9) year terms, conceivably long after the OLD membership will change once, if not twice. To allow the current members of OLD to basically perpetuate themselves in office as a non-profit corporation through (FloodComm) a public benefit corporation and maintain themselves in office for nine (9) years is violative of LSA-R.S. 42:3.
We realize that if the OLD had staggered terms this result may not obtain, however, it does not have staggered terms in that its members serve at the pleasure of the governor. SeeAndrepont v. Lake Charles Harbor and Terminal District,586 So.2d 722 reversed on other grounds by the Louisiana Supreme Court in No. 91-C-2521. 602 So.2d 704. In our opinion, the OLD cannot appoint itself to a public benefit corporation that will outlive the Levee Board by years.
Officials of FloodComm are officials or employees of a public body, OLD and FloodComm, see LSA-R.S. 42:1 which states,
 "As used in this title, the term "public office" means any state, district, parish or municipal office, elective or appointive, or any position as member on a board or commission, elective or appointive, when the office or position is established by the constitution or laws of this state.
 `Public officer' is any person holding a public office in this state."
FloodComm's Board of Directors membership is an appointive office because it is an office under the OLD which is authorized by LSA-R.S. 41:1215 B. Therefore LSA-R.S. 42:3
prohibits OLD from naming the board members of FloodComm to a term beyond the membership of the OLD which is concurrent with the governor's term.
See also Attorney General's Opinion 94-442. Officials of a public benefit corporation created pursuant to this state's statutes and able to administer public lands are simply not private parties exempt from the statutes relating to public bodies. FloodComm was established by the laws of this state, see LSA-R.S. 41:1215 or 1212 G.
D. Does the Levee Board have the legal authority todelegate to a public benefit corporation which it creates thepower to lease its property for any purpose? What is the legalauthority for doing so? Are there any limitations on the powerof the Levee Board to delegate such authority? Must there be anyrelation between the purposes of the levee district and thepurposes for which its lands may be used? Can the public benefitcorporation lease such lands for the purpose of establishing andoperating a fiber optic communications system? If so, must theuse of such a system be limited only to the purposes of the leveedistrict (since a public benefit corporation must have alegitimate public purpose and that purpose must relate to thestatutory purpose of the Levee Board)?
The Levee Board has the legal authority to delegate to a public benefit corporation the power to lease its property, notany purpose, but only for those purposes stated in LSA-R.S.41:1215, i.e., those purposes which constitute a publicpurpose. The public benefit corporation may lease such lands for the purpose of establishing and operating a fiber optic communications system, so long as the use of the system is limited to its statutory purpose. Further, any changes to the lease or sublease must be "approved by the [Levee Board as the] governing body of such political subdivision on behalf of which the corporation exercises its powers' pursuant to LSA-R.S.41:1215 B.
E. If the lease is subject to the provisions of LSA-R.S.41:1215, has the Levee Board complied with the criteria andprocedures provided therein, particularly LSA-R.S. 41:1215 B(4)and (8). Is LSA-R.S. 41:1212 G also applicable and has it beencomplied with?
As stated above in response to Questions 2A(1) and (2), the requirements set forth in LSA-R.S. 41:1212 G are applicable to this situation. LSA-R.S. 41:1212 G is applicable to the lease in question and requires that such lease "provide for a fair and equitable return of revenue to said public benefit corporation or political subdivisions."
In summary, it is our opinion that the Orleans Levee District formed a public benefit corporation (FloodComm Corporation), and the FloodComm entered into a valid lease with LeveeComm of Louisiana, L.L.C., pursuant to the provisions of LSA-R.S. 41:1212 G. Section 1212 G, not Section 1215 B(4) is the operative statute that governs the procedure and that OLD was required to follow when entering into the lease. There is no requirement that FloodComm negotiate with more than one prospective lessee. FloodComm must be satisfied that the lease entered into provides for a fair and equitable return of revenue to said public benefit corporation.
Under the terms of the OLD PBC Sublease and Right of Use Agreement entered into by and among OLD/LeveeComm Corporation (now FloodComm Corporation) and LeveeComm of Louisiana, L.L.C., FloodComm granted to LeveeComm the right to use a path four feet in width to install, operate, maintain and upgrade the equipment and plant of an advance telecommunications system. In return for the grant FloodComm is to receive a minimum monthly rental fee of $1,458.33 per month (the first 24 months of which have been received as an advance payment of $35,000) with the balance to be paid monthly beginning in the 25th month. FloodComm will also receive a percentage of LeveeComm's net operating income (as such term is defined in the Lease). FloodComm will receive 10% of the net operating income until LeveeComm has recovered its Capitalized Project Costs (as such term is defined in the Lease) at which time it will begin receiving 50% of the net operating income. On the face of the Lease there is nothing to indicate that the return to the Orleans Levee District is anything but "a fair and equitable return of revenue to [the] public benefit corporation."
The lease entered into by and between FloodComm and LeveeComm can have a term not exceeding ninety-nine years. LSA-R.S.41:1215 B(7) and (8) provide as follows:
 "(7) All leases or subleases executed by a public benefit corporation under the provisions of this Part shall be for a period not exceeding thirty years and shall provide for a monthly rental payable in cash, and
 (8) Notwithstanding the provisions of Paragraph (7) herein and R.S. 41:1217, any lease or sublease executed by a public benefit corporation under the provisions of this Part, in a municipality with a population in excess of four hundred seventy-four thousand, shall be for a period not exceeding ninety-nine years and shall provide for a monthly rental payable in cash."
The lease granted by FloodComm affects property located in a municipality with a population in excess of four hundred seventy-five thousand. Section 1215 (8) allows for a lease term not to exceed ninety-nine years.
4. Miscellaneous Issues.
 A. Does the Levee Board have the authority toprocure fiber optics communication facilities/services for thelevee district? Can it produce such facilities/services from acorporation which leases Levee Board property from a publicbenefit corporation created by the Levee Board and on whose boardlevee members serve? Can the Levee Board procure suchfacilities/services indirectly from such a corporation throughprocurement from the public benefit corporation? What legallimitations apply to such procurement? What procedures must befollowed?
Your first question in 4(A) is governed by the provisions of LSA-R.S. 38:307(A)(1), granting the Levee Board the "full and exclusive right, jurisdiction, power, and authority to locate, relocate, construct, and maintain, extend, and improve levees, embankments, sea walls, jetties, breakwaters, water-basins, and other works in relation to such projects . . ." We interpret this statute to empower the Levee Board to procure fiber optics communication facilities/services for the levee district, to meet the statutory purposes.
We have responded to the remainder of your questions in 4(a) in our response to question 3, above. The procedures and limitations applicable to FloodComm are those governing public benefit corporations as provided in LSA-R.S. 41:1215.
B. What entity has regulatory authority over a fiberoptic systems operated by a corporation which has been leasedLevee Board property for such purpose from a public benefitcorporation created by the Levee Board?
We must at this time refrain from addressing this issue raised by question 4(B). It is the policy of this office to decline rendering a legal opinion regarding issues that are presently being adjudicated by the courts or other authority. The issue of which entity has regulatory authority over the fiber optics systems in question is presently under consideration in the proceeding styled Louisiana Public Service Commissionvs. LeveeComm of Louisiana, LLC, Docket No. U-21123, filed August 25, 1994. We also invite your attention to the recent Supreme Court decision of City of New Orleans vs. Board ofCommissioners, 640 So.2d 237 (La. 1994).
Yours very truly,
 Richard P. Ieyoub Attorney General
Date Received: Date Released: May 16, 1995
RICHARD P. IEYOUB ATTORNEY GENERAL